IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KAREN A. THERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 05-6007-HU |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | FINDINGS AND |
| Social Security, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

DREW L. JOHNSON
KATHRYN TASSINARI
1700 Valley River Drive
Eugene, Oregon 97405

      Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

1 - FINDINGS AND RECOMMENDATION

FRANCO L. BECIA
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104

      Attorneys for Defendant

HUBEL, Magistrate Judge:

      Karen A. Therman brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for Disability Insurance Benefits. For the reasons set forth below, the decision of the Commissioner should be affirmed.

## Procedural Background

      Therman initially filed an application for benefits on June 5, 2002, alleging disability since April 15, 2001. Her application was denied initially and upon reconsideration. On June 10, 2004, a hearing was held before an Administrative Law Judge (ALJ). In a decision dated September 24, 2004, the ALJ found Therman was not entitled to benefits. On November 8, 2004, the Appeals Council denied Therman's request for review, making the ALJ's decision the final decision of the Commissioner. Therman now seeks judicial review of the Commissioner's decision.

## Factual Background

      Therman was 56 years old at the time of the hearing. She has a master's degree in business. She has worked as a dryer operator and front-end loader, safety facilitator, financial advisor, order taker, data entry clerk, and dog breeder. Therman alleges disability since April 2001 because of neurological problems.

**Medical Evidence**

In June 1998 Therman was diagnosed with moderate obstructive sleep apnea by Robert G. Tearse, M.D. Tr. 215. Dr. Tearse recommended a tongue advancement device and advised Therman to lose weight and avoid sleeping on her back. Tr. 288.

In October 1999 Dr. Tearse noted that Therman had lost 50 pounds and quit her night work. She was "sleeping much better with normal daytime alertness." Tr. 287.

In January 2000 Kate L. Beckstrand, M.D., diagnosed low back strain with "no specific areas of tenderness." Tr. 334. Straight leg raising caused increased back pain. Dr. Beckstrand prescribed Ibuprofen and provided samples of Skelaxin.

In February 2001 Therman complained of mild headache of two- week duration and positional vertigo. Tr. 333. Dr. Beckstrand diagnosed viral labyrinthitis, and instructed Therman to return if her symptoms did not clear in the next two to three weeks.

In May 2001 Therman was seen in Urgent Care complaining of chest pressure for the prior two weeks, a cough and shortness of breath. Tr. 331. On follow-up, Dr. Beckstrand noted that Therman's "fatigue troubles her more than anything." Tr. 330. Therman was "feeling stressed by her current job and looking for an alternative." Id. Dr. Beckstrand diagnosed atypical chest pain.

On May 16, 2001, Therman was evaluated by Jennifer Di Francesco, N.P., for complaints of exhaustion and fatigue. Tr. 329. Therman reported that her legs felt heavy, she was short of breath, her arms ached, her head hurt on the right side, she had chest pressure and diarrhea. Nurse Di Francesco noted that Therman's chest x-ray, EKG, blood work, and chemistry profiles were all normal, and suggested that Therman's "stressors from her job

which she dislikes - she does not like her boss, she does a lot of traveling - may be related to her feelings of fatigue." Id.

On June 6, 2001, Therman reported persistent chest pressure, vomiting, and intermittent diarrhea. Tr. 328. Dr. Beckstrand noted that her Cardiolite treadmill stress test was normal and that Therman's "previous concern of heart disease has basically been ruled out...." Id. Therman suggested "pancreatic cancer as the potential cause of her symptoms," but Dr. Beckstrand told her "that this is not typically the way pancreatic cancer would present." Id. Dr. Beckstrand referred Therman for a endoscopy.

On July 16, 2001, Therman was evaluated by Craig Chamberlain, M.D. prior to the endoscopy. Therman reported that she had experienced some diarrhea, "but her primary complaint is of an epigastric lower substernal vague discomfort which she states is improved with being seen by her naturopath and having her 'stomach' pulled down. She states that then she has resolution of this discomfort and has no difficulty with eating as large a meal as she likes." Tr. 229. The endoscopy revealed a small hiatal hernia with no obvious reflux or esophagistis, and Prevacid was prescribed for possible acid peptic symptoms. Tr. 230, 233.

On July 20, 2001, Dr. Beckstrand examined Therman for complaints of left arm pain radiating to the upper arm. Therman reported her diarrhea was ongoing, but intermittent. Dr. Beckstrand found no restriction in the range of movement of the neck with no limitation or hesitancy, and could find no significant trigger points in the paracervical or trapezius muscles. Therman had normal reflexes and strength of all the upper extremity muscles. Tr. 327. Dr. Beckstrand diagnosed a soft tissue injury, but could not rule out mild cervical radiculitis.

On August 27, 2001, Therman saw Dr. Beckstrand "to discuss concerns that she might have rheumatoid arthritis....However, she has absolutely no complaints that are more typical for rheumatoid arthritis, such as stiffness in the small joints of her hands, apparent synovitis in the small joints of her hands, etc. We did an arthritis panel on her a couple of months ago because of her other complaints and she had a normal sed rate and a negative ANA, and a rheumatoid factor of 21, which I did not think was very significant." Tr. 326. Dr. Beckstrand concluded that it was "highly unlikely" that Therman had rheumatoid arthritis, and ordered an MRI. Id.

The September 1, 2001 MRI showed some minor spondylitic changes. Tr. 339. There was no definite herniation. L. Paul Wilson, M.D., interpreted the exam and concluded that there were "subtle abnormalities on the right at 4-5 and on the left at 5-6 but they do not appear to be of significant severity to find the patient's symptom complex." Id.

On September 24, 2001, Therman reported some benefit from Wellbutrin, but it caused double vision and dizziness. The Wellbutrin was discontinued and replaced with Celexa. Tr. 325.

On September 28, 2001, Allan A. Goodwin, M.D., a spine specialist, examined Therman for her complaints of neck and headache pain. Therman described pain commencing the prior August, and aching across the occipital region and down in to the right aspect of the posterior neck, with the radiation of an aching pain up the right occiput, up to behind the right eye. Therman described an aching in the right shoulder and arm on occasion, and some numbness in the left hand. She stated that her headache and neck symptoms increase with sitting, standing, and walking, and decrease when she lies down. Tr. 359. Dr. Goodwin found

no evidence of significant neural foraminal narrowing and no impingement on the neural elements, and noted that it was "very possible" that Therman's headaches were emanating from the right C2-3 and C3-4 facets. Tr. 361. He administered a cervical injection.

On October 5, 2001, Therman reported no improvement in diplopia since discontinuing Wellbutrin. Dr. Beckstrand referred her to an ophthalmologist. Tr. 324.

On October 9, 2001, Dr. Chamberlain examined Therman for "epigastric discomfort." Tr. 377. Dr. Chamberlain noted some mild gastritis and a small hiatal hernia, but no evidence of esophagitis. Therman reported extreme fatigue, a headache on the right side of her head and double vision, and stated that she had "lost track of how many concussions and whiplash injuries I have had." Id. Dr. Chamberlain concluded that Therman's "abdominal symptoms may be part of a somatization disorder." Ibid.

On November 6, 2001, Therman reported to Dr. Goodwin that the facet injections had relieved the pain behind her right eye and the occiput. Tr. 358. Most of the arm pain was gone, and the mild pain in her neck was "quite tolerable." Id. An ophthalmologist had diagnosed cataracts and prescribed glasses.

On February 1, 2002, Therman reported that she was "doing somewhat better on the fatigue issue" but continued to have blurred and double vision. Tr. 319. She did not feel that she could drive safely. Dr. Beckstrand noted that Therman "is specifically pointing out to me today that she is more irritable than she has been in the past, and wonders if she should be having any cranial imaging studies done as a result of that." Id.

On February 7, 2002, Therman reported continued diplopia despite new glasses. Tr. 317.

On February 19, 2002, Therman reported to Dr. Tearse increased daytime fatigue and sleepiness during the past year. She described episodes of possible cataplexy. This is a sudden loss of muscle power without a corresponding loss of clear consciousness, following a strong emotional stimulus such as mirth, fear, anger or surprise. *Merriam-Webster's Medical Desk Dictionary* (rev. ed. 2002). Two to three times per week, she became severely fatigued with a sense of paralysis. Some of these reactions were associated with laughter. They were not triggered when she was startled, angry or in response to other emotional changes. Tr. 285.

Therman had daily headaches aggravated by neck movement and varying in severity. She had blurred vision and persistent dizziness. Tr. 285-86. Dr. Tearse opined that Therman's fatigue could be due to incomplete treatment of sleep apnea or narcolepsy.

On March 11, 2002, Dr. Tearse reported that testing revealed Therman continued to have moderate sleep apnea and restless leg syndrome. He prescribed Sinemet and pharyngeal surgery. Therman reported persistent dizziness, a tendency for her head to tilt to the right, and buzzing in her right ear. Dr. Tearse suggested that she "may have a degenerative inner ear process," and suggested an electronystagmogram to "clarify whether signs of inner ear or brain stem damage is present." Tr. 284. He planned to see Therman in three to four weeks, when she returned from a trip to Spain.

On April 5, 2002, Therman reported improvement in her restless leg syndrome, but continuing dizziness. Tr. 283.

On April 9, 2002, Dr. Cox performed cataract surgery. Tr. 310.

On May 5, 2002, Therman reported that her restless leg syndrome and sleep apnea were under control, but she had continued vertigo. Id.

On May 6, 2002, horizontal saccade testing by an audiologist suggested a central nervous system abnormality. Tr. 209.

On May 28, 2002, Therman reported that the dental appliance had stopped her snoring, however, she continued to have episodic spells of feeling lost and disoriented. She continued to be dizzy and had a low frequency hearing loss that interfered with karaoke. Tr. 283. Dr. Tearse noted moderate ataxia when attempting Romberg and tandem gait. He thought the vertigo was possibly due to cerebellar degeneration or inner ear damage. Id.

On May 31, 2002 an EEG was normal. Tr. 216.

On June 19, 2002, Therman advised Dr. Beckstrand that she had been diagnosed with a "central nervous system difficulty." Tr. 302.

On June 21, 2002, Therman reported that her sleep apnea and restless leg syndrome were well controlled on Neurontin, but she continued to have dizziness, blurred vision, double vision and a tendency to veer to the right when walking. She frequently felt off-balance. Tr. 282.

On August 22, 2002, Therman reported that acupuncture had reduced her fatigue, flushing, and necessary sleep duration. Id. She took naps, and complained of vertigo, blurring, headache and neck pain. Dr. Tearse advised her that the dizziness was likely permanent and she should accommodate it. Dr. Tearse noted that the vertigo was possibly due to previous head injuries and inner ear damage "but testing is inconclusive." Id.

On September 9, 2002, Therman was seen by Dr. Beckstrand for diarrhea "since she helped with some goats at the fair." Tr. 300. Therman expressed concern about E-coli infection and West Nile virus. Dr. Beckstrand noted that she was able to "arise comfortably

from the exam table and walk down the hallway without any obvious problems with her gait or balance." Id.

On September 16, 2002, Therman reported that her eyes tired easily when working at the computer, and that she had stopped driving because of diplopia. Tr. 299.

On October 2, 2002, Therman was examined by Dr. Goodwin for neck and low back pain. Tr. 356. She described pain in the right low back with positional radiation into the right leg and occasional numbness. Dr. Goodwin diagnosed probable facet pain at the C2-3 and C3-4 level. An October 5, 2002 MRI showed a "slight bulge at the annular level, L4-L5 without evidence of frank herniation or lateralizing disc fragment," and "specifically no right-sided phenomenon is seen to suggest etiology for radicular complex." Tr. 370. On October 15 and 23, 2002, Therman received cervical facet joint blocks with steroid injections to C2-3 and C3-4. Tr. 351, 353.

On October 29, 2002, Therman requested bariatric surgery, stating that weight loss attempts had been unsuccessful. Tr. 437. At 5'9", she weighed 291 pounds. Dr. Beckstrand thought the surgery was reasonable in light of her sleep apnea and arthritis.

On November 25, 2002, Therman reported dizziness, vertigo, abnormal vision and headaches. Tr. 412. Dr. Tearse noted dysmetric eye movements, but no obvious diplopia. Therman sat with her head tilted to the right and her right eye closed. Dr. Tearse diagnosed vertigo, "probably from head injury, with brain stem damage." Id.

On December 31, 2002, Therman reported several near-syncopal episodes. Tr. 411. She described poor eye-hand coordination and a tendency to list to the right when walking. Therman stated that she took brief rests every two to four hours. Id.

On February 20, 2003, Therman reported waking with a burning discomfort in her right leg, and a sense of spiders crawling on and across her leg. Tr. 411. She continued to have persistent headaches requiring 9-10 Advil.

On March 11, 2003, Therman's sleep apnea and restless leg syndrome were under control. She reported occasional leg discomfort in the evening, and insomia with prolonged awakenings twice a week. Tr. 409. Therman stated that she wakes "at 3AM and complains that 'spiders are crawling on my legs.'" Id. She continued to have headaches, accompanied by nausea and 15 minutes of blindness in her right eye. The nausea passed in 20-30 minutes. She stated that she felt imbalanced 2-4 times a day, and it seemed to be related to head movements. Id.

On April 18, 2003, Therman reported having two "seizures" while traveling in Spain, during which her feet felt tense and jerked and her neck extended. She did not lose consciousness. Dr. Tearse noted that seizure was unlikely with preserved awareness. Id.

An April 23, 2003 EEG was normal. Tr. 435.

On May 2, 2003, Therman continued to have "1 or two spells per week of jerks, stiffness or head 'humming'. No seizures or loss of consciousness. Poor balance, incoordination, poor memory and headaches vary from hour to hour." Id. Dr. Tearse noted that "[m]inor spells may be partial seizures or nonspecific signs of her condition," and increased her dose of Neurontin. Id.

On May 23, 2003, Therman described one or two episodes per week with 10-15 seconds of feeling confused and dissociated. Tr. 407. One episode included feeling dizzy with

a green tinge to her vision, buzzing in her ear, and a headache. She was concerned about intermittent red eyes. Dr. Tearse diagnosed partial seizures or dizzy spells.

On September 22, 2003, Therman's blackouts had ceased, but her headaches persisted. Tr. 406. Dr. Tearse noted that Therman reported that she "will catch her foot occasionally while walking but blames this on her poor distance vision." Id.

On November 3, 2003, Therman reported dizziness, paleness, headache, inattention, general 'heaviness' and difficulty using her arms. Id. Since increasing Neurontin the headaches were milder and she did not collapse or blackout with her spells. Therman stated that her spells "occur when she is active - shopping, cleaning, etc." Id. She reported difficulty learning new directions, such as to her son's home in Sacramento, and confusion when operating her new car with a standard transmission. Dr. Tearse noted a tendency to list to the right.

On November 10, 2003, Therman reported ongoing vertigo, worse when she exercised. Tr. 429. She stated that she had never actually fainted, but had 'seizures' that sometimes left her with altered consciousness or "waking up on the floor." Id.

On January 19, 2004, Dr. Tearse noted '[i]nitially she reports no further spells of blackouts or dizziness but later she says she is still having problems with dizziness and falls. She raised Neurontin to 1600 mg daily but this seems to cause confusion and poor judgment. She reduced to 1200. She notes her right foot tends to drag when walking." Tr. 401. Therman reported right frontal headache that did not usually require treatment, and a poor sense of direction when traveling outside of Eugene. Id. Dr. Tearse diagnosed headaches, ataxia, and diplopia of undetermined etiology. He continued to prescribe 400 mg of Neurontin three times a day.

On February 22, 2004, Therman sought emergency treatment for a headache. Tr. 455-57. A CT scan of the brain was negative for any acute changes or bleeding, and showed sinusitis. Tr. 426.

On February 24, 2004, Therman reported persistent mild headache and dizziness. Dr. Tearse diagnosed epilepsy, controlled on Neurontin. Tr. 401.

On March 3, 2004, Therman reported left flank and side pain. Tr. 424. Dr. Beckstrand suspected diverticulitis. Tr. 425.

On March 4, 2004, testing for optic neuritis was negative. Tr. 400.

On March 16, 2004, Therman reported improved headaches, but persistent dizziness and stumbling. Tr. 399.

On June 2, 2004, Dr. Tearse opined that Therman's medical condition prevented her from engaging in full time work. Tr. 462.

**Hearing Testimony**

Therman testified that she worked for Weyerhouser as a dryer operator and safety trainer for nineteen years. She worked 12 hour split shifts, and resigned on September 9, 1999. Tr. 468, 484-86. She worked as a financial advisor at Diversified Financial Concepts for two years, and stopped after her horse hit her in the head, causing dizziness and making it difficult for her to get to work. Tr. 467-70; 488-89. Therman stated that she had problems concentrating and remembering names and concepts, and that she would go home or her boss would take her home. Tr. 470.

Therman continued to work seasonally for Harry and David, earning about $1300 in six weeks. Tr. 471. She "gets lost" while filling an order and has to "kind of fake my way to

–keep doing the job." Tr. 473. She gets bad headaches after two to three hours, and asks to go home. Sometimes she gets upset and cries, and requires help. Tr. 474. The job is full-time for about two weeks, and part-time for about four weeks. By the end of the six weeks, Therman feels "pretty bad" and exhausted. She did not believe that she could do the job all year.

Therman breeds Chihuahua dogs for sale. Tr. 471. She spends about a half an hour per day caring for her dogs. She feeds her five horses hay flakes twice a day. Tr. 472, 494-95. She last rode a horse in December 1998. Tr. 473.

Therman testified that her eyesight improved after cataract surgery, but she still has double vision and problems with lights at night. Tr. 482. Her dizziness was the same as in May 2001, but the fatigue was worse and she was spending more time lying down. When she has double vision she is unable to work on the computer or read. Tr. 473.

Therman is dizzy most of the time and spends "at least 20 hours a day in bed because that's the place that I don't get dizzy." Tr. 474. This occurs every day. Sometimes she spends 23 and 1/2 hours in bed when her headaches are bad. Tr. 475. On those days, she only gets up to tend to her dogs. She does not watch television. She does listen to the radio. Sometimes she works on a laptop computer, in bed, writing web pages or answering e-mail, for as much as three or fours. At the time of the hearing, she had not worked on the computer for over a month. Tr. 476. Therman testified that she was lying down more at the time of the hearing than she had in July 2002, when a third party reported that she was lying down three times a day for two or three hours. Tr. 477.

Therman testified that she had recently fallen twice while shopping at a mall. Tr. 478. She falls at least twice a week. She does not do housework because she falls down. Tr. 478-79. She has two boarders living with her. They help with the yard, the dogs and the housework. Tr. 479-80. Therman drives two to three times a week to doctor's appointments, the veterinarian, and the grocery store.

## ALJ's Decision

The ALJ found that Therman has spondylosis, cervical and lumbar facet disease, occasional vertigo and seizures and a history of cataracts, which are severe impairments. Tr. 17. He found that she retains the residual functional capacity for light and sedentary work with no overhead reaching, no exposure to moving or heavy machinery, no climbing ropes or scaffolds, no crawling, and only occasional crouching or climbing of stairs. He found Therman not credible. Tr. 20-22. The ALJ rejected Dr. Tearse's opinion that Therman was unable to perform full-time work. Tr. 22.

The ALJ found that Therman retained the ability to perform her past relevant work as a financial advisor, data entry clerk, and dog breeder. Tr. 25. Alternatively, the ALJ found that Therman had the residual functional capacity to perform work identified by the vocational expert, specifically data entry clerk and financial advisor. Id.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her

disability.  <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  <u>DeLorme v. Sullivan,</u> 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *see also* <u>Andrews v. Shalala,</u> 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Andrews,</u> 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  <u>Martinez v. Heckler,</u>  807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however,  if "the evidence is susceptible to more than one rational interpretation."  <u>Andrews,</u> 53 F.3d at 1039-40.

### Disability Analysis

_____The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. § 404.1520.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel,</u> 180 F.3d 1094, 1098-99 (9th Cir. 1999):

<u>Step One</u>.  The Commissioner determines whether claimant is engaged in substantial gainful activity.  If so, claimant is not disabled.  If claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate claimant's case under step two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether claimant has one or more severe impairments.  If not, claimant is not disabled.  If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, claimant is disabled.  If claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of claimant's case proceeds under step four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether claimant is able to perform work he or she has done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step five.  20 C.F.R. § 404.1520(e),.

Step Five.  The Commissioner determines whether claimant is able to do any other work.  If not, claimant is disabled.  If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled.  If the Commissioner does not meet this burden, claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At steps one through four, the burden of proof is on the claimant.  Tackett, 180 F.3d

at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## Discussion

Therman contends that the ALJ erred by improperly (l) finding her not credible; and (2) rejecting the opinion of Dr. Tearse.

## I.    Therman's Credibility

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004). The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The ALJ must assess the claimant's credibility regarding the severity of symptoms if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996); Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986).

The ALJ may discredit a claimant's testimony regarding the severity of his symptoms by stating clear and convincing reasons that are supported by substantial evidence. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Smolen, 80 F.3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ

did not arbitrarily discredit the claimant's testimony." <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995); <u>Thomas v. Barnhart,</u> 278 F.3d 947, 958 (9th Cir. 2002).

The ALJ may consider objective medical evidence and the claimant's treatment history as well as the claimant's unexplained failure to seek treatment or to follow a prescribed course of treatment. <u>Smolen</u>, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the claimant's functional limitations. <u>Id.</u> In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. <u>Id.</u>; SSR 96-7p.

The ALJ considered proper factors as shown in the narrative of his decision. He found that the medical record "poorly supports her allegations of incapacitating physical impairments." Tr. 21. This is a reasonable interpretation of the medical evidence including the following examples.

Dr. Beckstrand was unable to identify any cause for Therman's complaints of chest pain, fatigue and light-headedness. Tr. 331. Multiple diagnostic investigations were normal, including blood work for rheumatoid factor, erythrocyte sedimentation rate, thyroid stimulating hormone, chemistry profile and complete blood count, upper gastrointestinal endoscopy, chest x-rays, a therapeutic trial of Wellbutrin and an ophthalmology work up. Tr. 320.

Testing revealed no cardiac abnormalities and Therman had a fair exercise capacity. Therman asserted neck and left-arm pain, but did not have any loss of cervical range of motion or neurological capacity. Tr. 327. Dr. Goodwin found that she had a normal gait and no neurological losses. Tr. 359-61. Therman had a full range of motion in the legs, arms and

neck. MRI and EEG studies were normal. Tr. 360. Dr. Tearse obtained minimal objective

findings as described more fully below. Tr. 282-84.

The ALJ also relied on inconsistencies between Therman's testimony and descriptions

of her activities:

> The claimant is not credible. Her dramatic testimony is at odds with her own statements in the record, as well as with those of lay sources, indicating that she is a very functional individual.
>
> The claimant's allegations that she spends at least 20 hours in bed, every day, is incredible on its face. Statements that she spends up to 18 hours a day sleeping are little better. Her contentions that she is functional for only a few hours a day are not consistent with the descriptions she herself has made of her daily routine activities, as well as with those of third party sources. In July 2002, long after the alleged date of onset, and concurrent with her claims of spending all but a few hours in bed, she was described as driving and shopping. She was using the internet, paying bills, reading and performing recreations such as karaoke once a week. The claimant herself concurrently stated that she performed karaoke three times a week.
>
> She was noted in October 2002, to go to a gym twice a week. In April 18, 2003, she was traveling in Spain. She told Dr. Tearse that she cares for horses, and told him in November 2003, that it was when she was shopping or cleaning that she had her "spells." These activities are not only inconsistent with the claimant's alleged acute fatigue, but with complaints such as double vision. She uses a computer and reads. There is little indication overall that her activities are being significantly interrupted by symptoms of fatigue, dizziness, poor balance, falls, or any other of the limitations she alleges result from her impairments.

Tr. 21.

The activity level described by the ALJ is supported by substantial evidence including Therman's disability questionnaires, her reports to physicians and a third party questionnaire. Tr. 100-13, 122-33, 141-47, 406, 409, 462.

The ALJ noted that Therman worked at a seasonal job in December 2003 and assisted a financial advisor until June 2002. On her application for vocational rehabilitation services in June 2002, Therman reported that she had been working 60 to 70 hours a week at her most recent job and had been fired when her employer discovered that she applied for another job. Tr. 192. In September 2003 Therman was working as a commercial dog breeder and taking on-line classes in management and web design.

The ALJ stated:

> The claimant's testimony that she is in bed most of the day, or even that she is significantly impaired, is contradicted by evidence of her owning and working in an ongoing business venture. Her attempts at reconciling her alleged impairments with her evident success in her business strain belief. It is not plausible that she uses her computer while lying down. When the time and effort associated with her commercial venture are added to what is known of her more routine daily activities, the claimant demonstrates a nearly normal ability to function.

Tr. 21.

The level of activity described in the record is clearly and convincingly inconsistent with the level of incapacity Therman claimed in her testimony; Therman described an essentially bed-bound lifestyle. The ALJ could reasonably conclude that a person with the incapacitating physical impairments Therman claimed in her testimony would not engage in the activities Therman pursued.

The ALJ also found evidence that Therman exaggerated her impairments in reports to her medical providers.

> The claimant's credibility is not only weakened by the contrast between her allegations of incapacity and her actual level of activity, but by apparent exaggeration of her underlying medical condition.

Tr. 21.

This is supported by substantial evidence. For example, Therman told Dr. Beckstrand that Dr. Tearse "told her that she probably had some sort of central nervous system difficulty." Tr. 302. Dr. Tearse actually found that her vertigo symptoms might "possibly" be from central nervous system damage or inner ear damage from previous head injuries; he felt one test suggested a CNS abnormality, but overall the testing was "normal" and "inconclusive." Tr. 282-83. Similarly, Therman told a vocational rehabilitation counselor that "she had damage to her brain stem." Tr. 187. At most, Dr. Cox gave this as one possible explanation for her visual symptoms. When tested, Therman had normal brainstem auditory evoked responses. Tr. 282, 371.

Therman told Dr. Chamberlain that she had "lost track of how many concussions and whiplash injuries I have had." Tr. 377. Therman left Dr. Chamberlain with the impression that she was somatizing symptoms. Id.

The ALJ also relied on medical opinions that Therman remained capable of performing some level of work. The DDS medical consultants reviewed Therman's medical records and concluded that although she has physical limitations, she retains the ability to perform the basic work requirements of light work. Tr. 385-89, 393. Dr. Tearse opined that she remained

capable of performing light manual work, at least on a part-time basis. Tr. 462. The ALJ rejected the part-time limitation, but even if it were accepted, Dr. Tearse's opinion would contradict the extreme limitations Therman claimed.

Based on the foregoing, the ALJ provided clear and convincing reasons supported by substantial evidence for discrediting Therman's testimony regarding the severity of her symptoms. Dodrill v. Shalala, 12 F.3d 918; Smolen v. Chater, 80 F.3d 1283. His findings are sufficiently specific to permit this court to conclude that he did not discredit her testimony arbitrarily. Orteza v. Shalala, 50 F.3d at 750.

## II.      Dr. Tearse's Opinion

As previously described, Dr. Tearse treated Therman for sleep disorders and daytime drowsiness beginning in June 1998. Tr. 213-15. In October 1999, Therman reported that she stopped working at night and was "sleeping much better with normal daytime alertness." Tr. 287. She then did not require treatment from Dr. Tearse for 2 ½ years. Tr. 285.

She returned to his care in February 2002, reporting episodes of drowsiness while working on the computer, watching television and shopping. She reported sleeping 11 to 12 hours each night and feeling rested in the morning, with drowsiness in the afternoon. She was taking daily naps of 30 to 60 minutes. Id.

In the ensuing months, Dr. Tearse saw Therman at about one-month intervals for reported fatigue, restless leg syndrome, dizziness, double vision, blurred vision and feeling off balance. On examination, Therman was alert and cooperative and mental state examinations were normal. She had mild gait ataxia. Therman claimed subjective diplopia, but Dr. Tearse found no visible opthalmoplegia. Tr. 282-84.

Dr. Tearse obtained minimal objective findings. Therman had no nystagmus, extra ocular movements intact, good extremity strength, good finger-nose-finger testing, normal EEG and normal brainstem auditory evoked responses. Electronystagmography showed "nonspecific findings but they suggest a [central nervous system] abnormality." Tr. 282. Dr. Tearse considered the overall testing "normal" and "inconclusive" regarding the etiology of her dizziness. Id.

There is no record of treatment by Dr. Tearse after August 22, 2002. On June 2, 2004, Dr. Tearse wrote a letter indicating that Therman had "episodic vertigo with severe imbalance and spinning" associated with "mild persistent imbalance and extremity clumsiness." Tr. 462. She also had headaches "which incapacitates her one or two days each month." He indicated that these had improved with migraine medication. Id. He opined that her remaining medical conditions, "including sleep apnea, obesity, kidney stones, and restless legs syndrome . . . do not currently impose any restrictions on her activities." Id.

Therman relies on the following statements from Dr. Tearse's letter:

> I find Ms. Therman's medical conditions will reasonably
> prevent her from engaging in full time regular work. . .
> I suspect she could do light manual work on a part time basis
> but full time labor would tax her physical capacities.

Id.

The ALJ considered Dr. Tearse's letter and concluded that it was not entitled to significant weight. Tr. 22. Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability. Magallanes v. Bowen, 881 F.2d 747,

751 (9th Cir. 1989). If the treating physician's opinion is not contradicted by another physician,

then the ALJ may reject it for clear and convincing reasons. Thomas v. Barnhart, 278 F.3d at

956-57.

The ALJ stated:

> In view of the claimant's poor credibility, Dr. Tearse's opinion
> of June 2, 2004 that the claimant could only perform part time
> work, cannot be given significant weight. The record shows that
> the claimant's alleged persistent imbalance, clumsiness,
> episodic vertigo or headaches, have not in fact had a significant
> effect on her functioning. Dr. Tearses's [sic] conclusions are
> largely based on the claimant's doubtful statements to him, and
> not on diagnostic findings.

Tr. 22.

As described in the previous section, substantial evidence supports the ALJ's finding

that Therman continued to engage in activities that were inconsistent with incapacitating

limitations from persistent imbalance, clumsiness, episodic vertigo or headaches.

Dr. Tearse obtained minimal objective findings and described grossly normal clinical

observations in his treatment notes. The absence of abnormal findings supports the ALJ's

conclusion that Dr. Tearse reached his opinion based primarily on Therman's subjective

statements. An ALJ can properly reject a physician's disability opinion that is premised on the

claimant's own subjective complaints of disabling symptoms which the ALJ has already

properly discounted. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989); Tonapetyan v. Halter,

242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ also found that:

> In general, Dr. Tearse provides no basis for his opinion that
> while the claimant could perform part time work, she could not

> work on a full time basis.  The nature of her alleged symptoms,
> as she reports them, would be expected to prevent work
> entirely, should they affect her ability to work at all.

Tr. 22.

The ALJ is correct that nothing in Dr. Tearse's letter or treatment records explains why

Therman's  problems with imbalance or headaches would be worse with full time work than

with part time work.  He did not identify specific work related activities or environments that

might trigger or exacerbate these symptoms.

In summary, the ALJ gave sufficient reasons, supported by substantial evidence in the

record, for rejecting the disability opinion of Dr. Tearse.

## Conclusion

The ALJ applied proper legal standards and his conclusions are supported by

substantial evidence.  The Commissioner's final decision should be affirmed and the case

should be dismissed.

**Scheduling Order**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due January 9, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due January 23, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this __19th__ day of ___December___, 2005.

                                 __/s/__ Dennis James Hubel_____
                                   Dennis James Hubel
                                   UNITED STATES MAGISTRATE JUDGE